UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| LANCE TRAVIS, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-623 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| KURT JONES, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 25 to 50 years, imposed by the Ingham County Circuit Court on February 23, 2000, after a jury convicted Petitioner of second-degree murder, in violation of MICH. COMP. LAWS § 750.317. In his *pro se* petition, Petitioner raises one ground for relief, as follows:

> I.     PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE TRIAL COURT REFUSED TO ALLOW A CRITICAL DEFENSE WITNESS TO TESTIFY THAT SHE DID NOT HEAR PETITIONER UTTER A THREAT OF DEATH TO REBUT AN ALLEGATION OF SUCH POSED BY THE PROSECUTION.

Respondent has filed an answer to the petition (docket #13) stating that the ground should be denied because it lacks merit. Upon review and applying the AEDPA standards, I find that Petitioner's ground for habeas relief is without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from an April 23, 1999 stabbing death of Oscar Ordonez that followed an altercation between Petitioner and Ordonez at Petitioner's home, 1110 East Grand River in Lansing, Michigan.  Petitioner was charged with one count of first-degree murder, and following a preliminary examination on May 6, 1999, he was bound over on a charge of open murder.  Petitioner defended the charge on the grounds of self-defense.  On October 25, 1999, after an eight-day jury trial, a mistrial was declared when the jury could not reach a verdict.  Petitioner was tried before a second jury over a period of eleven days, beginning January 10, 2000, and concluding on January 28, 2000.

The following facts are substantially taken from Petitioner's brief to the Michigan Court of Appeals, which was accepted by the prosecution in its own brief on appeal.  (See Appellant's Brief on Appeal, Docket #54; Appellee's Br. on Appeal at 1, Docket #54.)

On the first day of testimony, Petitioner moved to permit character evidence of Oscar Ordonez's superior physical abilities.  (Tr. III, 178-82.)  Defense counsel sought to question Ordonez's sisters about his recent body building, as well as his high school wrestling and football participation.  Specifically, counsel sought to demonstrate that the victim's physical abilities and strength were greater that those of Petitioner. (Tr. III, 181-82.)  The trial court ruled that the defense could introduce Petitioner's own knowledge of the victim's violent behavior and whether he observed the victim lifting weights. However, Petitioner would not be allowed to introduce evidence of which he was not aware at the time of the incident.  (Tr. III, 182.)

Enedelia Loredo testified that she had twin sisters, Rosa Linda and Erminia Ordonez, and that Oscar Ordonez was her brother. (Tr. IV, 85-86.) Oscar had a three-year-old son, Ricky, for whom Loredo cared while Oscar was at work. (Tr. IV, 87.) Erminia Ordonez was the former girlfriend of Petitioner and had lived with Petitioner and Rosa Linda at the house at 1110 East Grand River. (Tr. IV, 90-93.) At one time, Oscar Ordonez also lived there with Petitioner. (Tr. IV, 93.)

According to Loredo, at approximately 6:00 p.m. on Wednesday, April 21, 1999, Petitioner drove to Loredo's house in his Astro van. Petitioner was in the driveway when Oscar Ordonez came inside the house to tell Loredo that Petitioner wanted return of the stove he had been storing at Loredo's home. Loredo went outside and told Petitioner she would give him the stove if Petitioner would pay for the gold chains he purchased from Loredo's friend, for which he had not paid. Petitioner laughed at Loredo and said he would call it an even trade. Loredo got angry and reached into the van to pull the chains off Petitioner's neck. Petitioner put his van into reverse and began to back out. Oscar Ordonez ran to stop the van and grabbed the antenna. He then let go of the van, breaking off the antenna. (Tr. IV, 101-08, 134-37, 151.)

The following day, Thursday, April 22, 1999, Loredo and Oscar Ordonez discussed filing a complaint against Petitioner with the Lansing police for making a death threat. (Tr. IV, 110-11, 152-54.) On Friday, Loredo watched Ricky while Oscar Ordonez was at work. When Ordonez arrived at Loredo's home at approximately 12:15 p.m., they started downtown to report the threat. Ordonez drove his own car, in which Ricky also rode. Loredo followed in her car. (Tr. IV, 110-15, 207.)

As they drove west on Grand River, they passed 1110 East Grand River, where Loredo saw Petitioner waving and pointing at Oscar Ordonez. Ordonez turned his vehicle around

in a driveway and drove back to 1110.  He pulled into the driveway shared by 1108 and 1110 East

Grand River.  According to Loredo, as Ordonez turned into the driveway, she saw Petitioner open

the sliding door of his van and grab a long object, like an oversize screwdriver, and stick it in his

pants.  Petitioner stood next to his van, waiting for Ordonez, with one hand beneath his sweater and

the other in a closed fist.  (Tr. IV, 119-21, 199-202.)  Ordonez got out of his car and walked up to

Petitioner, grabbing him in a bear hug.  (Tr. IV, 117, 121, 184-86.)  Ordonez and Petitioner were in

the narrow space between Petitioner's van and the house, a space narrow enough that the two could

not stand side-by-side across the width.  (Tr. IV, 183-84; Tr. VIII, 10.)  The two struggled, while

Ordonez's arms were wrapped around Petitioner.  With his left hand, Petitioner pulled an object out

of his pants and stabbed Ordonez at the base of the right side of the neck.  (Tr. IV, 121-24, 185-88,

203.)  The two men continued to struggle, moving toward the back of the van.  Loredo pulled into

the driveway next to Ordonez's car.  When she got out, she saw Ordonez running toward her with

blood coming out of his mouth.  Ordonez collapsed on the hood of Loredo's car.  (Tr. IV, 125-27.)

Petitioner grabbed a bag from his van and ran away.  Loredo flagged down a school bus and told the

driver to call the police.  (Tr. IV, 128-29.)

       Rosa Linda Ordonez testified that she lived with her twin sister, Erminia Ordonez,

and Petitioner at 1110 East Grand River for part of the four-year period Petitioner and Erminia were

involved with one another.  (Tr. V, 17-18.)  On the evening of Wednesday, April 21, 1999, Petitioner

twice called Rosa Linda at work (Tr. V, 22).  The first call was prior to 6:30 p.m. (Tr. V, 23).

According to Rosa Linda, Petitioner told her that he had tried to kill Oscar Ordonez by running him

over because Oscar had ripped the antenna off the van.  Petitioner was angry and threatened that "he

was going to try to kill [Oscar Ordonez]."  (Tr. V, 24, 35.)  The second call was placed between 9

and 9:30 p.m. (Tr. V, 24).  During the second call Petitioner told Rosa Linda to meet him at 1110 East Grand River to sign a van title over to him which she did.  (Tr. V, 25-27, see also 36).  Late that same evening, Rosa Linda met personally with Petitioner at 1110 East Grand River and signed the title of the van over to him.  (Tr. V, 20-21, 25-27, 37.)  Two days later, as she was driving home after depositing her pay at her bank, she saw Oscar Ordonez and Enedelia Loredo on the ground in front of the house at 1108 East Grand River.  She got out of her car and attempted to put pressure on Oscar's stab wound.  (Tr. V, 30-32, 38-40.)

Bernadette Larner, a 911 dispatcher for the Lansing police, testified that Petitioner called at 12:20 p.m. on April 23, 1999.  (Tr. VI, 13-15; Tr. of 911 call, App. to Appellant's brief, Docket #54.)  Petitioner told the dispatcher that he had been attacked by his girlfriend, her brother and her sister at 1110 East Grand River.  Petitioner reported that he was not hurt but was very upset and thought he had hurt the man "real bad."  (Tr. VI, 21, 23-25, 27, 32.)  Larner directed officers to 917 Johnson, the house from which Petitioner was making his call.  Petitioner was arrested without incident.  He was cooperative, but extremely agitated and upset.  He was "breathing very hard and sweating, sweating really hard."  (Tr. III, 137-39, 155-57.)

During their investigation of the incident, the police found in Oscar Ordonez's pants a box cutter with blood on it (Ex. 3).  (Tr. VI, 142-43, 147.)  They also recovered a golf club shaft (Exhibit 7) and a knife (Exhibit 8) in two different yards within three blocks between 1110 East Grand River and 917 Johnson.  (Tr. IV, 35-41, 61-67; Tr. VI, 45-46, 56-61, 174, 195; Tr. VIII, 5, 65-66.)

Crime Scene Investigator Bruce Holliday testified that the space between Petitioner's van and the house was only three feet, too narrow for two people to stand shoulder to shoulder.

- 5 -

(Tr. VI, 182, 196; Tr. VIII, 10.)  Holliday testified that investigators found blood on the window of the passenger side cargo door of the van, as well as bloody fingerprint marks on the back of the front right passenger seat.  (Tr. VI, 179-80, 183; Tr. VIII, 15, 44-45, 884-85.)

Doctor Laurence Simson, a pathologist, testified that Oscar Ordonez was 5'11" tall and weighed 190 pounds.  Ordonez was 26 years old and "well-muscled."  (Tr. V, 46.)  Aside from small scratches and an abrasion to the knee, the sole wound Ordonez had was a circular stab or puncture wound behind the right collarbone, near the junction of the chest and neck.  (Tr. V, 47-50, 73-74, 93-94.)  The wound penetrated downward, through the trachea and aorta and scraped the right lung, causing Ordonez to bleed to death very rapidly.  (Tr. V, 52-53, 57.)  Simpson testified that the wound could have been caused by the golf club shaft, but not by the knife.  (Tr. V, 72-76, 80, 83, 85, 96.)

Michigan State Police serologist, Dr. Julie Howenstine, testified that there was a significant amount of human blood on both sides of the blade of the knife.  She also found a weak reaction to the presence of human blood from the soil compacted inside the golf club shaft, though there was no blood on the outside or the inside of the shaft.  (Tr. V, 122-26, 137-40.)  Petitioner's jeans had blood on them.  (Tr. V, 132-37.)  Howenstine found blood stains on Oscar Ordonez's box cutter.  (Tr. V, 144-49, 188-91.)  According to Howenstine, it was possible that Ordonez's blood had transferred to the cutter blade by seeping through his pants.  (Tr. V, 148-49.)  Howenstine believed that Ordonez's wound and the hole in his collar were consistent with being cut by a dull knife, such as Exhibit 8.  (Tr. V, 163-65, 171-73, 196-98.)

Cathy Kuebler, a DNA analyst employed by the Michigan State Police, found that the blood samples taken from the knife (Exhibit 8), Petitioner's jeans and shirts all came from Oscar

Ordonez. She was not given a sample from the box cutter for testing, and she could not obtain a result from the sample retrieved from the golf club shaft. (Tr. VI, 96-100, 105, 106.)

Daniel Basinger testified for the defense that he lived at 917 Johnson Street in Lansing. On April 23, 1999, when Petitioner arrived at Basinger's house, Petitioner was very upset, scared and shaking, and his shirt was ripped. Basinger called 911 for Petitioner, and Petitioner talked with the dispatcher. (Tr. VIII, 117-20, 124.)

Rebecca Walter testified that she knew Petitioner through one of his older brothers, Billy Travis. (Tr. VIII, 167.) On the evening of Wednesday, April 21, 1999, Petitioner and Terrance Green came to her house. Petitioner was upset about what had happened at Loredo's house earlier. At Petitioner's request, Walter called Rosa Linda Ordonez at work and then handed the phone to Petitioner. The call was on the speaker phone and Walter listened to the conversation. (Tr. VIII, 167-70.) When counsel asked her to tell the gist of the conversation, the prosecutor objected on the grounds that it called for hearsay. Defense counsel responded that she was not offering the conversation for the truth of the matter discussed, but to refute the testimony of Rosa Linda Ordonez that Petitioner had threatened to kill Oscar Ordonez. The trial judge sustained the objection, stating that offering testimony "that the threats were not made" was inadmissible hearsay. (Tr. VIII, 170-71.) Walker testified about only one telephone call between Petitioner and Rosa Linda, the one in the vicinity of 9 p.m. This was the only time Petitioner talked to Rosa Linda in Walker's presence (Tr. VIII, 176-177).

Petitioner testified in his own defense. He stated that he met Erminia and Rosa Linda Ordonez when he moved to Lansing from Mississippi in August 1994. He began going out with Erminia, and they eventually had two children. He, Erminia, and Rosa Linda lived together for

approximately four years, including at the house at 1110 East Grand River.  In 1995, Oscar Ordonez also lived with them at the East Grand River address.  The relationship between Petitioner and Erminia Ordonez ended in late 1998 or early 1999.  (Tr. IX, 15-16, 20, 28, 30-35, 128, 213-14.)

Petitioner stated that, at the time of the incident in question, he was in the process of moving from 1110 East Grand River to 1224 West Maple.  Most of his property was still at the East Grand River house, including his furniture, his cassette tapes and CD's, clothing and personal hygiene items.  (Tr. IX, 35, 56, 65, 68.)   On the evening of Wednesday, April 21, 1999, Petitioner drove with Terrance Green to Enedelia Loredo's house to get the stove he had stored there.  No one answered when Petitioner honked his horn.  As he began to leave, Oscar Ordonez arrived and said he would help.  Loredo came out of the house and Petitioner asked for his stove.  Loredo yelled at Petitioner about the gold chains he had bought from a friend of hers but had not paid for.  Loredo reached in the window of the van and tried to grab the chains from Petitioner's neck, but Petitioner leaned away.  As Petitioner started to leave, Oscar Ordonez jumped in his way and ripped the antenna off Petitioner's van before Petitioner could drive away.  (Tr. IX, 49-55, 60, 130-31, 158-61.)

Petitioner had purchased the Astro van from the Ordonezes in 1997. He paid cash to Erminia Ordonez, but the title was never signed over to him.  (Tr. IX, 26-27.)  After the incident on April 21, 1999, when the antenna was broken, Petitioner drove to the house in which his brother and Rebecca Walter lived.  After supper, he called Rosa Linda at her job and asked her to sign over the title of the van, and she agreed.  (Tr. IX, 57-59, 131-32, 161.)  Petitioner denied making any threats to any member of the Ordonez family during the call.  (Tr. IX, 59.)   Petitioner admits he made another call to Rosa Linda from a different location and that no one else was in the room when he made this call, but claims he did not speak to Rosa Linda personally on this occasion (Tr. IX, 59-60).

After she got off work at 11:30 p.m., Rosa Linda came to Petitioner's house at 1110 East Grand River and signed over the title to him. (Tr. IX, 39, 60-64.)

On Friday, April 23, 1999, Petitioner awoke at 1224 West Maple and drove to the house on East Grand River to continue moving, arriving at about noon. (Tr. IX, 66-68.) He pulled into the driveway and turned his van so that it was pointed toward the street. (Tr. IX, 68-70.) He was in the van when he heard a car door slam. He took a couple of steps from the van and saw that Oscar Ordonez had pulled into his driveway and that another car was behind. Oscar Ordonez was coming toward Petitioner. (Tr. IX, 95, 98.) Oscar Ordonez told Petitioner that he was going to kill Petitioner. Ordonez had something in his hands that Petitioner thought was a weapon, but Petitioner did not know what it was. (Tr. IX, 75, 166-68, 192.) Petitioner denied having waved at Ordonez while Ordonez was driving down the street. Petitioner also denied putting something into his pants. (Tr. IX, 95, 98.) Oscar Ordonez attacked him, grabbing him and slamming him down in the van, knocking the wind out of him. Ordonez squeezed him so that he could not breathe. Ordonez's sister, Enedelia Loredo, was trying to grab Petitioner's gold chains. Oscar Ordonez was pulling Petitioner out of the van while trying to crush him. Because Ordonez was very strong, Petitioner could not get away, but he got an arm free and tried to hang on. Petitioner testified that he knew that Ordonez was a body builder and had been a wrestler. (Tr. IX, 77-81, 184.) Petitioner described being crushed and squeezed by Ordonez, which hurt his back and ribs and prevented him from breathing. Petitioner stated that he was losing consciousness and managed to grab something from inside the van with which he hit Ordonez, causing Ordonez to drop him. (Tr. IX, 77-81, 171-73, 196.) He did not know whether he hit Ordonez with a screwdriver, the knife or the golf club shaft. (Tr. IX, 163-65,186-88, 194, 225-26.) Once Ordonez let go of Petitioner, Ordonez moved off into

- 9 -

the driveway.  Petitioner saw blood on his clothes and got out of the van.  He was attacked by Loredo and struggled to get away from her.  Petitioner saw Ordonez bleeding and told Loredo to help Ordonez.  Petitioner did not have a phone in the house and said he did not know of a phone on his street.  He left 1110 East Grand River and went as fast as he could to 917 Johnson, where he called 911.  (Tr. IX, 82-83.)  Petitioner's ribs, back and left leg were hurt.  After the police arrested him at 917 Johnson, they took him to the police station and then to the hospital for treatment.  (Tr. IX, 81-83, 89-90, 93.)

Because Terrance Green was not available to testify at the second trial, Green's testimony from the first trial was read to the jury.  (Tr. X, 14.)  Green testified that on Wednesday, April 21, 1999, he was helping Petitioner to move from his old house at 1110 East Grand River to his new house on Maple street.  (Tr. X, 15-16.)  The two later drove to Loredo's house to ask about Petitioner's stove.  (Tr. X, 18.)  Loredo tried to grab Petitioner and Petitioner tried to drive away.  Oscar Ordonez grabbed the mirror and antenna on Petitioner's van and broke off the antenna.  (Tr. X, 18-20, 34.)  Petitioner and Green went to Petitioner's brother's house, where Petitioner telephoned Rosa Linda Ordonez to ask her about signing the title of the van over to him.  Green testified the conversation was on the speaker phone but that he only heard part of it (Q: "All right. You heard this phone call?"  A: "Yes, I heard part of it.") (Tr. X, 20).  Counsel asked if he heard any threats, but then withdrew her question based on a sustained objection in the first trial.  (*Id.*)  Green testified that Petitioner still had furniture in the Grand River house, including a weight bench, an entertainment center, a waterbed and a couch.  (Tr. X, 26-27.)

The trial judge instructed on first-degree premeditated murder, second-degree murder, and voluntary manslaughter.  (Tr. X, 139-43.)  The court also instructed on self-defense, including

- 10 -

the duty to retreat and to avoid using deadly force if one can safely do so.  (Tr. X, 143-45.)  Defense counsel objected to the judge's refusal to give the standard Michigan instruction that a person had no duty to retreat while in his own dwelling.  (Tr. X, 148-152.)

During deliberations, the jury asked the trial court to "[e]xplain self-defense.  Can a person use more force than is being used against him?"  The trial judge referred them to their notebook with the written instructions and told them she had no further instructions on self-defense. (Tr. X, 158-59.)

At the conclusion of the trial, on January 28, 2000, after approximately seven hours of deliberation, the jury found Petitioner guilty of second-degree murder.  (Tr. XI, 3-4.)  On February 23, 2000, Petitioner was sentenced to serve a term of imprisonment of 25 to 50 years.  (Sentencing Transcript 28, docket #52.)

### B.  Motion for New Trial

Petitioner filed two motions for new trial, arguing, among other things, the issue presented in this habeas petition.  After a hearing, the trial court denied both motions.  (Mot. for New Trial Tr., 13-15, docket #53.)

### C.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on December 13, 2000, raised three issues, including the issue raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #54.)  By unpublished opinion issued on August 16, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 8/16/02 Mich. Ct. App. Opinion ("MCOA Op."), docket #54.)

- 11 -

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals. By order entered May 8, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #27.)

Petitioner initially filed the instant application for habeas relief on September 18, 2003, in the Eastern District of Michigan. The matter was transferred and filed in this Court on September 26, 2003.

### **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and

- 12 -

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law,

unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

As his sole ground for habeas relief, Petitioner asserts that he was denied his right under the Sixth Amendment's Confrontation Clause to present a defense when the state court refused to permit Rebecca Walter to rebut Rosa Linda Ordonez's testimony that Petitioner threatened to kill Oscar Ordonez during a telephone conversation on April 21, 1999. Walter, who was present during one of two April 21, 1999 telephone conversations between Petitioner and Rosa Linda that Rosa Linda testified occurred, was prepared to testify that the alleged threat was not made during that conversation. (However, as will be discussed below, Rosa Linda testified the threat occurred during the call Walter did not hear.)

Although appellate counsel raised the claim in the context of both the Confrontation Clause's protection of the right to present a defense and MICH. R. EVID. 607, 801(c) and 802, the court of appeals addressed only the state-law claim:

> Defendant first argues that the trial court erred in refusing to allow a defense witness to testify about a telephone conversation she heard. We agree with defendant that the testimony was improperly excluded; however, the error was harmless. The decision to admit or exclude evidence is within the trial court's discretion and should be reversed only where there is a clear abuse of that discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). An abuse of discretion exists where a decision insults both fact and logic, reflects a perverse exercise of will, defies the exercise of judgment, or is based on passion or bias, rather than reason. *Dep't of Transportation v Randolph*, 461 Mich 757, 768; 610 NW2d 893 (2000).

> "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Nonverbal conduct may constitute a statement as contemplated by the prohibition against hearsay, but only if the person intended the nonverbal conduct to be an assertion. MRE 801(a).

> In this case, a prosecution witness testified to a telephone conversation between herself and defendant, in which the witness alleged defendant threatened to kill the victim. The defense witness would have testified that she heard the entire telephone conversation via a speakerphone, and defendant never made such a statement. The trial court excluded the defense witness' testimony as hearsay; however, the witness' testimony involved the *absence* of an assertion. Therefore,

- 15 -

the trial court erred in excluding the witness' testimony because the substance of the proposed testimony was not hearsay.

However, because the improperly excluded evidence did not prejudice defendant, the error was harmless. *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996). The prosecution witness' testimony supported the prosecution's theory that defendant deliberately, and with premeditation, killed the victim, while the defense witness' testimony would have refuted the element of premeditation. The jury convicted defendant of *second*-degree murder; thereby implicitly rejecting the prosecution's theory of premeditation.

(MCOA Op. at 1-2; docket #54.)

"'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986) (internal quotations omitted)). Evidentiary rules abridge the right to meaningful opportunity to present a defense if such rules both "infring[e] upon a weighty interest of the accused" and are "arbitrary" or "disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). *See also Holmes*, 126 S. Ct. 1731.

In *Washington v. Texas*, 388 U.S. 14 (1987), the Court rejected as arbitrary a state statute that barred a person who had been charged as a participant in a crime from testifying in defense of another alleged participant unless the witness had been acquitted. Under the statutory prohibition, the defendant was precluded from calling as a witness a person who previously had been charged and convicted of committing the same murder. The Court held that the rule violated the defendant's right to put on a defense. *Id.* at 22-23.

Similarly, in *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973), the defendant called as a witness a man who previously confessed to the murder for which the defendant was being tried. When the witness repudiated his confession on the stand, the defendant was barred from

treating the man as an adverse witness under the state's "voucher" rule, which barred parties from impeaching their own witnesses. *Id.* at 294. In addition, the state hearsay rule did not include an exception for statements made against penal interest. As a consequence, the defendant was barred from introducing evidence that the witness had previously made self-incriminating statements to three other people. The Court noted that the state did not even make an attempt to explain the rationale of the voucher rule. The Court held that the exclusion of the evidence, together with the limitation on cross-examination, denied the defendant the right to a fair trial. *Id.* at 302. *See also Rock v. Arkansas*, 483 U.S. 44, 56-58 (1987) (statute barring admission of all hypnotically refreshed testimony held to be an arbitrary restriction on the right to testify in the absence of clear evidence by the state repudiating the validity of all such recollections); *Crane*, 476 U.S. at 691 (rule preventing defendant from attempting to show at trial that his confession was unreliable because of the circumstances under which it was obtained was not supported by rational justification that would warrant wholesale exclusion of such potentially exculpatory evidence).

In the instant case, the court of appeals found that the exclusion of Walter's testimony, as a witness to a telephone conversation in which Petitioner allegedly made threats against Oscar Ordonez, was a misapplication of the state's hearsay rule. Upon review, I conclude that the exclusion of Walter's testimony also violated Petitioner's constitutional right to present a defense.[1] Allowing Rosa Linda Ordonez to testify that Petitioner made a threat while not permitting another witness to testify that the alleged threat was not made is both arbitrary and unsupported by rational justification. As the state court noted, the evidentiary exclusion was a misapplication of the hearsay rule. Walter did not propose to testify about any statement or conduct made by Petitioner that might be used to prove the truth of his intent to kill Oscar Ordonez. Instead, she merely proposed to testify

---

[1]As previously discussed, where the state court clearly did not address the merits of a claim, a habeas court conducts *de novo* review. *McKenzie*, 326 F.3d at 727; *see also Wiggins*, 539 U.S. at 534; *Maples*, 340 F.3d at 437.

as to whether, in fact, the statement was made.  Indeed, the content of her testimony was what *was not* said rather than what *was* said.  Because the state court concluded that the testimony was not properly excluded under the hearsay rule, the exclusion cannot be said to have served the ordinary purpose of the hearsay rule, which is to protect against unreliable evidence.  *See Holmes*, 126 S. Ct. 1732 (citing *Washington*, 388 U.S. at 22-23) (rejecting rationality of exclusion where exclusion did not serve its asserted purpose).  The exclusion therefore was both arbitrary and disproportionate, particularly in the absence of any purpose.  That absence of rational purpose and arbitrariness must be balanced against the fact that the exclusion of the evidence was important to Petitioner's right to refute the suggestion that he had planned to kill Ordonez two days before the death occurred.  *Cf. Washington*, 388 U.S. at 22-23 (exclusion of testimony of another charged participant found arbitrary and violative of defendant's right to present a defense); *Chambers*, 410 U.S. at 294 (prohibition against impeachment of defendant's own witness not sufficient to outweigh right of cross-examination).  Therefore, under clearly established Supreme Court precedent, the exclusion of Walter's testimony violated Petitioner's right to present a defense.

However, notwithstanding the fact that the exclusion of Walter's testimony may have violated Petitioner's right to present a defense, he is entitled to relief only if the error was not harmless.  "[C]onstitutional error is cause for federal habeas relief only if it has 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)), *quoted in Fulcher v. Motley*, ___ F.3d ___, 2006 WL 996615, *14-15 (6th Cir. Apr. 18, 2006)).  In determining whether Confrontation Clause error is harmless . . . , the reviewing court should consider: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on

material points, . . . and, of course, the overall strength of the prosecution's case." *Hill*, 337 F.3d at 718 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Neither side has the "burden" of proof on the issue, but when "the record is so evenly balanced" that "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995), *quoted in Fulcher*, 2006 WL 996615, at *14-15. I do not have any such grave doubt about whether this evidentiary error had a substantial effect on the verdict. Rosa Linda testified that Petitioner telephoned her twice on April 21, but only made the threat in question during the first call. Rebecca Walker, who was not allowed to testify about the telephone call she heard, was privy only to the second call when no threat was made. Compare Tr. V, 22-24, 25-27 with Tr. VIII, 176-177. Terrance Green, who also did not testify regarding this call, only heard "part of it." (Tr. X, 20). Thus, even if the jury had heard and had believed the testimony of these two witnesses about the second call, none of it was inconsistent with the testimony of Rosa Linda. The jury could have believed all three witnesses and still found that Petitioner had made a threat to kill the decedent.

The harmless error standard adopted by the Supreme Court in *Brecht*, 507 U.S. 619, for application to constitutional error on habeas review was taken from the federal harmless-error standard applied to non-constitutional error on direct review. *See Brecht*, 507 U.S. at 631 (holding that the "*Kotteakos* [*v. United States*, 328 U.S. 750 (1946)] standard is thus better tailored to the nature and purpose of collateral review, and more likely to promote the considerations underlying our recent habeas cases."). "Under [the *Kotteakos*] standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. Here, the

Michigan Court of Appeals applied the statutory Michigan harmless standard for nonconstitutional error, as discussed by the Michigan Supreme Court in *People v. Mateo*, 551 N.W.2d 891 (Mich. 1996). In *Mateo*, the Michigan Supreme Court declined to decide the precise standard encompassed by Michigan's statutory "miscarriage of justice" language, but concluded that

> The statute is consistent with the view of the Court in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Under our statute, as under federal law, a reviewing court is not to find nonconstitutional preserved error harmless simply because it concludes the jury reached the right result. Disregarding errors that do not affect substantial rights, the reviewing court is to examine the record as a whole and the actual prejudicial effect of the error on the factfinder in the case at hand. *People v. Lee*, 434 Mich. 59, 450 N.W.2d 883 (1990). Where the error asserted is the erroneous admission of evidence, the court engages in a comparative analysis of the likely effect of the error in light of the other evidence.

*Mateo*, 551 N.W.2d at 892.

The *Mateo* standard is consistent with both *Kotteakos* and *Brecht*. As a consequence, the Michigan Court of Appeals applied the same harmless-error standard applicable on habeas review under governing Supreme Court precedent. The state court's determination that the error was harmless therefore is entitled to deference by this Court under the AEDPA unless it constitutes an unreasonable application of the facts under the *Brecht* standard. *See* 28 U.S.C. § 2254(d)(1).

The Michigan Court of Appeals concluded that Walter's testimony that Petitioner did not threaten to kill Oscar Ordonez would be relevant only to the charge of first-degree premeditated murder. Because the jury rejected the charge of first-degree murder and found Petitioner guilty only of second-degree murder, the court of appeals concluded that the exclusion of Walter's testimony was harmless.

Petitioner argues that the evidence was not merely relevant to the first-degree murder charge, but also was relevant to the jury's determination of whether Petitioner acted with the requisite malice necessary to prove second-degree murder. Although the evidence was principally

relevant to the issue of premeditation, Petitioner's argument may have some force.  A reasonable jury arguably could have concluded that, while the Rosa Linda Ordonez's testimony about a threat was insufficient to show that Petitioner had premeditated the killing, the threat increased the likelihood that he had the requisite intent to kill when he stabbed Ordonez in the driveway of 1110 East Grand River.  Further, because the evidence in the instant case was entirely dependent on the credibility of the parties, the exclusion arguably had the potential to influence the outcome, especially in light of the fact that this case resulted in a hung jury in its first trial and a lengthy deliberation in the second trial.  As a result, were the Court to have decided the question in the first instance, it might have reached a different result than that of the Michigan Court of Appeals.

However, as previously stated, a federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Instead, the question before this Court is whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams*, 529 U.S. at 410.  Applying the deference due the state-court determination under the AEDPA, I am not persuaded that the state court's harmless error determination constituted an unreasonable application of established Supreme Court precedent.  Accordingly, I recommend the Court reject Petitioner's claim that he was denied his right to present a defense.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 30, 2006                          /s/ Hugh W. Brenneman, Jr.
                                              Hugh W. Brenneman, Jr.
                                              United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).